Ramiro Morales - 167947
William C. Reeves - 183878
MORALES FIERRO & REEVES
1440 Maria Lane, Suite 200
Walnut Creek, CA 94596
Telephone: 925/288-1776
Facsimile: 925/288-1856
E-mail: lawoffice@mfrlegal.com

Attorneys for Plaintiff
Kinsale Insurance Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KINSALE INSURANCE COMPANY, | ) | Case No.: |
| Plaintiff, | ) ) | COMPLAINT |
| v. | ) ) | |
| AMBER-TRU CONSTRUCTION, INC., ERIC OWIESNY, SHAREEN HARVEY and STARR SURPLUS LINES INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff Kinsale Insurance Company ("Plaintiff") alleges as follows:

1.    At all relevant times herein, Plaintiff was and is an Arkansas corporation with its principal place of business in Virginia.

2.    On information and belief, defendant Amber-Tru Construction, Inc. ("Amber-Tru") is a California corporation with its principal place of business in California.

3.    On information and belief, defendants Eric Owiesny and Shareen Harvey (collectively "Claimants") are individuals who reside in California.

4.    On information and belief, defendant Starr Surplus Lines Insurance Company ("Starr") is an Illinois corporation with its principal place of business in New York.

5.    The acts and/or omissions at issue in this litigation took place in this judicial district.  Venue, therefore, lies with this Court, as a substantial part of the events which are the subject of the claims asserted herein are located and/or took place in this judicial district.

1

6.      Meanwhile, this Court has diversity jurisdiction pursuant to 28 U.S. C. § 1332 as the parties are diverse and the amount at issue excess the jurisdictional minimum per statute.

General Allegations

7.      The Claimants commenced with an arbitration proceeding against Amber-Tru styled *Owiesny v. Amber-Tru Construction*, JAMS Arbitration Case Reference No. 110011928 ("Underlying Matter") in which the Claimants asserted claims of defects and damages to a single family home located at 209 Grattan Street in San Francisco ("Project") that Amber-Tru constructed.  Of significance, the Claimants in the Underlying Matter asserted damages associated with alleged defective work that Amber-Tru self performed at the Project, including, but not limited to, the installation of windows as well as the installation of siding and framing work ("Self Performed Work").

8.      On information and belief, Starr issued Amber-Tru a commercial general liability insurance policy in effect between 2015 and 2016 ("Starr Policy") which generally affords coverage to Amber-Tru for damages because of "property damage" caused by an "occurrence" in which the damage occurred during the policy period and coverage was not otherwise excluded and/or barred with the term "property damage" generally defined as physical injury to tangible property and "occurrence" generally defined as an accident.

9.      In response to a tender made on behalf of Amber-Tru in connection with Underlying Matter, Starr failed to respond such that it effectively disclaimed coverage.

10.     Kinsale separately issued Amber-Tru commercial general liability insurance policies in effect between 2016 and 2019 ("Kinsale Policies") which also generally afford coverage to Amber-Tru for damages because of "property damage" caused by an "occurrence" in which the damage occurred during the policy period and coverage was not otherwise excluded and/or barred, including one or more exclusions for damages associated with the Self-Performed work.

11.     Kinsale, who also received a tender, agreed to provide Amber-Tru a defense in the Underlying Matter, albeit subject to a full and complete reservation of rights.

12.     Following a hearing in the Underlying Matter, the arbitrator issued a Final Award

("Award"), a copy of which is attached hereto as Exhibit A, in which sums awarded to the Claimants included damages to correct and repair the Self-Performed Work as well as damages associated with defects for which no physical injury to tangible property had occurred.

## CAUSE OF ACTION NO. 1 - Declaratory Relief

### As Against Amber-Tru and Claimants

13.     Plaintiff incorporates by reference the allegations in all of the preceding paragraphs.

14.     Plaintiff is informed and believes and on that basis alleges that it owes no duty to indemnify Amber-Tru in connection with the Award as to damages associated with the Self-Performed Work as well as damages associated with defects for which no physical injury to tangible property had occurred.

15.     On information and belief, Defendants dispute this position.

16.     By reason of the foregoing, an actual controversy exists between the parties, requiring a declaratory judgment of this Court.

17.     A judicial determination of this controversy is necessary and appropriate in order for the parties to ascertain their rights, duties and obligations.

Wherefore Plaintiff prays for relief as set forth below.

## CAUSE OF ACTION NO. 2 - Declaratory Relief

### As Against Starr

18.     Plaintiff incorporates by reference the allegations in all of the preceding paragraphs.

19.     Plaintiff is informed and believes and on that basis alleges that Defendant owed a duty to defend Amber-Tru in connection with the Underlying Matter.

20.     On information and belief, Defendant disputes this position.

21.     By reason of the foregoing, an actual controversy exists between the parties, requiring a declaratory judgment of this Court.

22.     A judicial determination of this controversy is necessary and appropriate in order for the parties to ascertain their rights, duties and obligations.

1    Wherefore Plaintiff prays for relief as set forth below.

2                    CAUSE OF ACTION NO. 3 - Equitable Contribution

3                                    As Against Starr

4    23.    Plaintiff incorporates by reference the allegations in all of the preceding

5    paragraphs.

6    24.    Defendant had an obligation to contribute, on an equitable basis, towards the sums

7    Plaintiff has incurred or will incur in connection with the Underlying Matter.

8    25.    Defendant has failed to contribute their fair and equitable share toward the

9    settlement.

10    26.    Defendant is obligated under the principals of equity to reimburse Plaintiff for the

11    sum it paid toward the settlement in excess of its equitable share.

12    Wherefore, Plaintiff prays for judgment against Defendant as hereinafter set forth.

13                    CAUSE OF ACTION NO. 4 - Equitable Indemnity

14                                    As Against Starr

15    27.    Plaintiff incorporates by reference the allegations in all of the preceding

16    paragraphs.

17    28.    Defendant has not paid its equitable share of the sums Plaintiff incurred in the

18    Underlying Matter.

19    29.    Plaintiff is entitled to reimbursement from Defendants of all sums Plaintiff has paid

20    in excess of its equitable share in connection with the Underlying Matter.

21    30.    Defendant is obligated under the principals of equity to indemnify Plaintiff for the

22    fees and costs that it has inequitably incurred in connection with the Underlying Matter.

23    Wherefore, Plaintiff prays for judgment against Defendants as hereinafter set forth.

24                                    Prayer

25    As to the First Cause of Action:

26    1.    For a declaration and determination regarding the scope and extent of Plaintiff's

27    obligation to indemnify Amber-Tru for the Award;

28    As to the Second Cause of Action:

COMPLAINT

1.    For a declaration and determination regarding whether Starr owed a duty to defend Amber-Tru in connection with the Underlying Matter.

As to all causes of action:

1.    For monetary damages;

2.    For interest; and

3.    For all other relief the Court deems just and proper.

Dated: January 6, 2023

MORALES FIERRO & REEVES


By:    */s/ William C. Reeves*
        William C. Reeves
        Attorneys for Plaintiff

COMPLAINT

# EXHIBIT A

JAMS ARBITRATION CASE REFERENCE NO. 110011928

**Eric Owiesny, Shareen Harvey,**

     **Claimants,**

         **and**

**Amber-Tru Construction,**

     **Respondent.**

---

## FINAL AWARD

**Counsel:**

Bryce Carroll, Esq.
 492 Ninth Street Suite 220
Oakland, CA 94607
carroll@oles.com
Claimant Phone: 510-903-2001
Fax: 510-903-2015
Counsel for Claimants Eric Owiesny and Shareen Harvey

Robert Hamilton, Esq.
 One Post Street Suite 2100
San Francisco, CA 94104
rhamilton@gnhllp.com
Respondent Phone: 415-705-0400
Fax: 415-705-0411
Counsel for Respondent Amber-Tru Construction

**Arbitrator:**

Hon. Ignazio J. Ruvolo (Ret.)
JAMS, Walnut Creek Resolution Center,
1255 Treat Blvd., Suite 700,
Walnut Creek, CA 94597
Iruvolo@jamsadr.com

1

**Place of Arbitration**:

Remote hearing with participants appearing via Zoom

**Date of Interim Award**: August 19, 2022

THE UNDERSIGNED ARBITRATOR, having been designated by the parties and having examined the submissions, proof, and allegations of the parties, finds, concludes, and issues this Final Award as follows:

## I.

### Introduction and Procedural Statement

This arbitration demand (Demand) arises out of a construction contract between the parties relating to new home construction at 209 Grattan Street, San Francisco, Ca. (Project) Claimants allege that Respondent did not perform its work as required under the contract resulting in deficiencies relating to the Project, as alleged on page 3 of the Demand.

These alleged constructions deficiencies included the following:

1. Improper flashing of windows and doors causing water intrusion into framing and interior living areas

2. The prefabricated windows and doors are leaking causing water intrusion into framing and interior living areas

3. Cracking of stucco which is allowing water intrusion behind the stucco

4. Improper installation of stucco during wet weather causing discoloration in stucco finishes

5. Stucco was installed without an engineered sealant joint around window and door perimeters allowing water intrusion behind stucco

6. Wood siding and trim were not primed allowing paint to peel from wood surfaces

7. Cracks were seen throughout the interior wall surfaces of the residence

8. Sheetrock fasteners "pops" were seen throughout the walls and ceiling of the residence

9. Interior trim at some locations of the wood stair treads was not installed flush with adjacent surfaces

10. Cracking was observed on some solid wood stair treads

11. Sealant joint between wood tread and sheetrock surfaces was separating

As a result of the deficiencies or defects in Respondent's work, Claimants seek a judgment for the costs to repair these deficiencies or defects against Respondent, including an award of attorney fees and costs per Section 9(b) of the Project contract.

A Response to Claim (Response) was filed by Respondent which denied the allegations in the Demand, and pleaded twenty-nine separate affirmative defenses.

The Arbitrator was selected as the sole arbitrator pursuant to the arbitration agreement contained in Paragraph 9c of the Project contract (Arbitration Agreement) which was referenced in, and attached to, Claimants' Demand. Various orders were issued regarding the procedures for the arbitration, including a Final Pre-Arbitration Conference Order, dated March 24, 2022, and an Order Confirming and Ordering Remote Arbitration Hearing, dated April 1, 2022.

One in limine motion was filed by Respondent seeking an order denying Claimants' claims for consequential damages, including any costs to rent another residence while construction repairs are being performed in 209 Grattan Street. An opposition brief was filed by Claimants opposing the motion. After considering the relative legal positions of the parties, a written order was filed denying Respondent's in limine motion.

The arbitration hearing was conducted on June 1-3, 2022. Each parties offered testimonial and documentary evidence at the hearing, and evidence not deemed inadmissible following objections was admitted. Objections sustained or overruled to the exhibits and to the questions propounded to the witnesses by counsel are noted in the hearing transcript prepared by Tracy Sato, Certified Shorthand Reporter in California CSR No. 13013. To the extent any objected to documents are referred to in this Final Award, the objections are overruled. To the extent the documents are not referenced in the Final Award, the documents are not deemed sufficiently probative to be included in the summary of evidence considered, and therefore, it is unnecessary to rule on those objections.

Six witnesses were called to testify by direct examination and cross-examination. Summaries of their testimony are included below.

At the conclusion of the presentation of evidence, the parties stated that they had no further evidence to offer as to this phase of the proceeding. The Arbitrator then ordered that simultaneous closing briefs not exceeding 25 pages may be filed by the parties on or before Wednesday, July 13, 2022 followed by reply briefs not exceeding 10 pages to be filed by Monday, July 25, 2022. The arbitration hearing be deemed closed upon completion of the submittal of briefs, in accordance with JAMS Rule 22(h).

After briefing was completed, and in accordance with the timing of schedule set by the Arbitrator, the Interim Award was issued on August 19, 2022.

Near the conclusion of that Interim Award counsel and the parties were notified that "[i]f any

further decisions or determinations need to be made before this Interim Award becomes final, including the amount of interest, .attorney fees and costs to be awarded, if any, to the prevailing party, counsel are directed to contact the Arbitrator's Case Manager, Lisa Midel, within seven days from the date of this Interim Award to arrange for a conference at which the need for any such additional decisions will be discussed including any further briefing. Any further determinations to be made at any further hearing or based on written submissions shall be embodied in a Final Award which shall also incorporate the contents of the Interim Award."

A post-Interim Award conference was held with counsel on September 1, 2022, to discuss post-Interim Award decisions, determinations, and briefing. (Scheduling Order No. 8) At that conference, Claimants' counsel indicated an intention to file a motion for an award of attorney fees and costs in accordance with the parties' underlying contract. Respondent indicated an intention to oppose the motion. It was agreed that the motion would be submitted for decisions on the briefs. Post-Interim Award briefing was concluded on October 24, 2022. Consideration and decisions on those motions are discussed below in this Final Award.

## II.

### Facts

The factual findings that follow are those deemed necessary to the Award. They are derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing, and which were admitted as evidence. The summary of witness testimony and exhibits relate to that submitted by the parties as to the disputed issues. Not all of this evidence necessarily is relevant to the conclusions reached in this Final Award. To the extent that these findings differ from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written.

### A. Eric Owiesny

Mr. Owiesny, his spouse and three daughters have lived in the Project home since the Spring of 2016. The Project was designed by architect John Pearlman. The couple interviewed three potential general contractors and hired Respondent Amber-Tru. The contract price was $1,156,180 and an addition $100,000 or so was added during the course of construction by change orders. Included in the contract was Paragraph 2(a) which provided:

"Performance Standard. Subject to the terms and conditions of this Agreement, Contractor will perform or supply the Construction for the contract price set forth herein in a professional and workmanlike manner consistent with industry standards therefor."

The Project was completed shortly before the family moved in. Although completed, the Project has some "punch list" repairs that needed to be done. Some were completed and some were not.

With the commencement of the late 2016-2017 rainy season, Mr. Owiesny noticed water leaks at some windows, weeping and staining on the exterior stucco, leaking and water streaks

on the soffit over the main bedroom and around the sliding door.

Other observed problems with construction included that the door on the kitchen dishwasher was causing steam damage to the adjacent wood cabinet, interior drywall fasteners were popping out in various areas of the home, cracks appeared in the upper corners of windows and doors, and the stair treads were separating.

A representative of Marvin Windows made multiple visits and retrofitted bottom framing in some windows. The problem was window leaks was not resolved. Mr. McShane from Amber-Tru stated at one point that he thought the windows themselves were defective.

When the leaks persisted, Mr. McShane provided the name of a water testing company, Smith Emery Labs, which he had gotten from Marvin. Smith Emery came out and water tested seven windows all of which failed. A copy of the Smith Emery test report was given to Respondent. (Ex. 11)

Continued discussions about the unresolved problems with Respondent were unsuccessful and in the late Summer of 2020, Claimants contacted an attorney. Shortly thereafter, Avelar was hired to inspect the home. To assist the consultant, Mr. Owiesny prepared a list of the problems the family was experiencing. (Ex. 74) He did not include a list of every window that was found to be leaking, and in fact, some of the windows did not leak.

Despite the retrofit repairs of the windows made earlier, the windows continued to leak. In fact, there are still problems with leaking as of now. As of the winter storms in October and November 2021, no additional photos were taken of the leaks because Mr. Owiesny felt there already was enough documentation.

In December 2020, in the third level bedroom the ceiling was "bowing" with water in it. It appeared that this intrusion was coming from the outdoor deck area above it, and it was leaking from this bedroom into the second-floor bathroom below the bedroom.

Another problem was with the exterior stucco which was installed while it was raining. Ms. Harvey complained about its appearance, and it never looked good. In addition to stucco, other exterior surfaces had wood siding and the paint on some of the siding was peeling.

A letter dated December 30, 2016 was provided to Respondent itemizing "open" issues. (Ex.1017) As of that time, they did not notice window or door leaks. However, by February 2017, leaking windows were observed in several locations. Exhibit 1003 is a consolidation of emails exchanged by the parties over time relating to problems with the Project. These included reporting leaky windows on February 7, 2017, (page 570) the powder room bathroom window leaking on November 29, 2018 (page 581), the powder room window continuing to leak as of January 17, 2019, (page 583), the kitchen nook window continuing to leak, reported on March 2, 2019 (page 586), and windows continuing to leak as of December 2, 2019, which was damaging the baseboards (page 591).In all, the majority of the home's windows were found to be leaking water from the exterior.

### B. Shareen Harvey

Ms. Harvey works from home with her husband and three daughters. She recalled that the leaking began during the first rainy season after the family moved into the home in April 2016. The leaks would move from one window to another in other rooms. There was a water puddle under the baseboard of one of the daughter's bedroom.

Claimants asked Mr. McShane for a water testing consultant and Smith Emery was recommended. Before Smith Emery came out and did its testing, Marvin and Amber-Tru had been there doing repairs on the windows known to be leaking. After the repairs the windows were tested and were found still to be leaking. A copy of the Smith Emery report was sent to Respondent, asking whether the window themselves were leaking or if it was from the installation.

Ms. Harvey was asked to itemize the window leaks by room. She believed that a total of 11 windows are still leaking. These include nook windows which leaked last year, the powder room window, three windows in the main dining area, two windows in the family room, three of the four windows in daughter Vivian's bedroom, daughter Mariette's bedroom had the Bay window leaking and the ceiling was ballooning from an overhead leak, and the laundry room window was found to be leaking this past year. There was no leak in the window of the girls' bathroom or in daughter Samone's room. The leaks continued in the Fall of 2021.

In addition to the water leaks, there are nail pops "everywhere."

### C. Eric Archuletta

Mr. Archuletta has been a licensed architect for 11 years, and a general contractor for 22 years. About 60% of his work now is consulting, and 40% working on projects. He has been retained by both plaintiff and defense counsel involving construction litigation. His firm has worked with Claimant's counsel in about 30-40 cases. He has had his deposition taken 32 times in cases in which he was retained by the plaintiff, and this is his third experience testifying at an arbitration hearing.

He was retained in this matter to investigate concerns by the owners about residential problems they were having. His work included an initial site investigation, and destructive testing. He prepared a report outlining his findings, repair estimates and expected costs. He also commented on the construction work performed by Respondent. In addition, Mr. Archuletta reviewed the Smith Emery water test report, the construction contract, the architectural drawings, and he looked at Marvin Window's literature.

Mr. Archuletta recalled being at the site three times. The first was in September 2020 for a visual site visit, then again in late September when a roof deck leak was brought to his attention. His last visit was in mid-November 2020 when he did his own water testing.

6

He recalled observing the conditions itemized in Mr. Owiesny's letter (Exhibit 74). He also reviewed the Smith Emery report of water testing using negative air pressure to simulate a raining day experience. He was familiar with the ASTM E1105B test used by Smith Emery.

Mr. Archuletta's report (Exhibit 81) includes the defects he found based on his work and inspection. These include separations of the interior stair treads, defects in the exterior cement (or stucco) plastering including excessive cracks (Exhibit 60, page 571), exterior cracking near the west side bedroom windows (Exhibit 100), cracking throughout the west elevation wall (page 1264), water damage around an exterior light fixture (page 1270), indications of water leaching out of the exterior stucco because of no seal joint (Exhibit 102), and many cracks in the stucco.

His Investigation with destructive testing revealed discoloration behind the stucco and rusting of the lath wire both indicating moisture was passed through the stucco. (Exhibit 62, page 621) In some areas he found and reported stucco that was thinner than the industry standard which would cause weak points tending to create cracks. (page 632) His examination of the north elevation, which he water tested, showed that the stucco joints were not tight allowing water to pass through the stucco (page 246). In another location he found that the J-mold was not long enough allowing the intrusion of water (page 247). His moisture readings of the plywood surface under the stucco were 17, 18, and 19 (pages 252-253). There are high readings.

The condition of the Bay Window on the north elevation was defective as well. This included cracking and staining under the window (Exhibit 61, page 585), large corner cracks in the pop out (page 586), rusted lath wire and staining on the back of the stucco (page 600), stucco less than ½ inch thick in some places, and other indications that there was water intruding through the stucco at this location (page 615). Exhibit 106 itemizes many of the stucco defects discovered by Mr. Archuletta through this area including photographs on pages 1417, 1422, 1427, and 1435. At one location where he had not performed any water testing, the water meter reading was 35 (page 1439).

In conclusion, Mr. Archuletta's opinion was that much of the exterior stucco was not installed properly and that all of the stucco should be removed and replaced. He noted also that in some locations, such as the West Side, the stucco was in tight or smaller areas around windows that need further repair or replacement, and it was easier simply to replace all of the stucco here.

In addition to the stucco issues, the exterior wood siding was defective. In some areas the paint was peeling off the wood indicating the lack of any primer used. Such large areas of unpeeling indicate the paint was put directly on raw wood. There is no adhesion between the paint and wood unless a primer is used first. (Exhibit 53, pages 359, 361; Exhibit 97)

As noted, Mr. Archuletta performed his own water testing on some of the windows, including one already retrofitted by Marvin or its associate. The testing showed water intrusion at the bottom of the window. (Exhibit 51, pages 281, 286) He noted that this window had been

7

retrofit with a "pan" and the injection of some sealant. Because the "reverse lap" membrane in some windows was not long enough, the pan could not be connected to the exterior membrane and water could not leave the pan to dry outside the residence. For this reason, the retrofit pan is not a good fix for this window water intrusion. He noted that this "fix" was attempted at other window locations including the West Wall daughter's bedroom. The same retrofit pan had been installed but it was not properly installed because the pan was not tied to the "reverse lap" membrane.

Thus far, ten windows have had retrofit work done on them. He believes that all of this repair work was inadequate to fix the window leakage problem at multiple locations at the residence.

Instead, Mr. Archuletta believed that all windows in the residence should be removed and replaced with new windows. New flashing around the windows is needed as well. New windows also will raise the "comfort level" of the Claimants who have endured window leaks for so long. In support of his recommendation, Mr. Archuletta referred to a written communication from Amber-Tru to the Claimants expressing the view that the windows are "faulty." (Ex. 109)

In turning to door problems, Mr. Archuletta noted the discovery of water intrusion on the inside corner of the La Cantina door. (Ex. 63) His recommended fix is to remove, reflash the opening, and install a new door assembly. He also found evidence of staining on the wood flooring at the corner of the east facing sliding door that needs repair. (Ex. 107, pp. 1509-1510) Also, all of the stucco around the La Cantina doors needs replacement. (Ex. 81)

Mr. Archuletta recalled that he was first called out when there was an upper roof deck leak that was intruding into the bedroom below. The deck pavers were removed and standing water was found. The pedestals that support the pavers were covering some of the drains. He found that the as built condition of the deck drains were not the same as called for by the plans. The plans showed larger drains which were covered by dome grates. These are better protection against sediment clogging. (Ex. 9, p. 21) There were breaches in the deck membrane found that allowed the backed up water to seep down into the bedroom. This caused bubbling of the bedroom ceiling, and damage to the sheet rock in the baseboard area. (Ex. 56, pp. 413, 415) Once the ceiling was exposed it revealed damage to the ceiling wood framing which was confirmed by a high moisture meter reading. (Ex. 56, p. 423) The repairs needed included removal and relocation of the pedestals, and the installation of new drains, grates, and membrane.

The interior drywall finish is a Level 4 finish. In some areas it did not look like the finish even reached this level. There was excessive cracking at the interior door openings. (Ex. 81)

More serious is the number of "screw pops" everywhere throughout the interior. They are noted with blue tape in the site photos. (Exs. 35, 36, 38) The pops were random. Based on the large number of them, Mr. Archuletta concluded that the most probable cause was that the wall

framing was wet when the drywall was installed. The necessary repair is to rescrew the drywall and refinish it once again. This includes repairs at the baseboard as well.

In the kitchen there was damage to several cabinets adjacent to the dishwasher. Apparently, steam from the dishwasher when it is opened had damaged the cabinet faces and they need repair.

As to the peeling paint on the exterior wood siding, Mr. Archuletta recommends that all of the wood siding be removed and replaced.

The Bay Window location needs repair and potential beam replacements. The wood eves needed repainting.

The witness also reviewed Amber-Tru's expert scope of repair (Ex. 1001), and he reviewed the expert's (Mr. Vanecko) deposition. Mr. Archuletta disagreed with a number of Mr. Vanecko's opinions and recommendations. First, he disagreed that the window can be repaired by applying retrofit pan flashing. He also disagreed with Mr. Vanecko's opinion that the water continuing to intrude through the windows is "incidental water"—water that intrudes but which does not cause damage. Mr. Archuletta believes the water damage he saw around the windows and doors was damaging the framing and window panels, and thus, was not "incidental water,"

His site visit on September 2020 was a walk through and he did not take notes. The photos he took documented what he observed.

Mr. Archuletta referenced Exhibit 74 which was Claimants' outline of issues. He confirmed that Claimants were not reporting that all windows were leaking.

He received a copy of the Smith Emery testing report (Exhibit 11), noting that seven windows were water tested and all leaked. While Smith Emery used negative pressure in its water testing, Mr. Archuletta and Mr. Mills did not water test using negative pressure.

As to the use of negative pressure in water testing, it is up to the tester whether to use it. Using negative pressure does not induce more leaks than without it. It is used to simulate a normal storm with wind driven rain.

The witness did not know what the weather conditions were when Smith Emery did its water testing. He agreed that high winds during water testing could impact the testing results.

Mr. Archuletta himself tested two windows randomly selected in the stucco exterior area and both leaked. He found water in the sill pan of both windows. In examining the exterior area around the two windows, he found deteriorating building paper, wet wood framing and water spots on the exterior plywood. He noted that retrofit pan was put inside to stop the water from

entering the interior. He added that Mr. Vanecko also tested three windows and moisture was found in one of the windows.

Mr. Archuletta did not believe that these window leaks can be repaired simply by resealing them in place. You would just cover up the damage.

Instead, the witness believed that the conditions found justifies the removal and replacement of all of the Marvin windows. While Marvin windows are generally quality products, and he did not know of anything wrong with these models, even one drop of water in the window justifies replacement because of a "product failure." Once again, Mr. Archuletta referred to Mr. McShane's email in which he states the windows themselves may be "defective." (Ex. 109). He noted too that based on all of the testing done 10 windows had a "leaking issue."

On cross-examination, Mr. Archuletta agreed that if the windows themselves are not leaking (no product failure) they can be resealed and reflashed.

Mr. Archuletta also believed that all of the doors should be replaced although they have not been tested. He agreed on cross-examination that reflashing of the doors, rather than replacement is a possible solution.

As for the exterior stucco, Mr. Archuletta believed that it all must be replaced. He noted that at least 55% of the stucco will have to be removed just to do the window repair work. You are simply taking out too much stucco to do the repairs. Also, the cumulative amount of cracking is unacceptable even if they do not exceed the 1/16 inch standard. During his investigation, Mr. Archuletta found numerous areas where the stucco was less in thickness than industry standard, and needed to be replaced. He also found rusting of the wire lath indicating that water is getting through the stucco. Also, backer rods were supposed to be installed behind the stucco and were not installed. This deviation also contributes to inadequate stucco performance.

### D. Anthony Mills

Mr. Mills has been in the reconstruction business involving defect repairs since 1992. He obtained his general contractor's license in 2001. He has worked on hundreds of projects with Avelar. He is now a Senior Consultant with Reconstruction Services.

He was retained in this matter to review the scope of repair work recommended by Avelar (Exhibit 81) and prepare a cost estimate for the work. He also was asked to review the repair estimates submitted by BCS (Mr. Vanecko's firm). In doing this work, Mr. Mills reviewed the report by Mr. Archuletta, the testing results, and photographs. He also reviewed the original construction plans so he could better develop estimates for repair quantities.

Exhibit 84 is Mr. Mills' "take off" diagram to set quantities and Exhibit 85 is the summary of his "take off" items and quantities. Exhibit 83 is his preliminary cost of repairs

chart. Also helping him understand the scope of the repair project on the Project is the fact that Mr. Mills is currently engaged in another residential repair project just four or five blocks away. This work has emphasized how keeping the construction work "continuously cleaned" is necessary not only for the project but also for the close neighborhood.

The replacement lath and stucco will be a three-coat system and will cost a total of $111,646. The removal, replacement, and repainting of the exterior wood walls will total $88,503. The exterior repairs relating to the Bay Window will cost a total direct cost of $10,365. The total direct costs for all exterior work is $211,566.

The removal, replacement and reinstallation of windows in the stucco exterior area is estimated to cost $21,692 while the removal replacement and reinstallation of windows in the wood exterior wall portion of the Project will cost a total of $50,249. Mr. Mills estimates that the replacement of doors in the stucco exterior area will cost $9,929 while the replacement of exterior doors in the wood siding portion of the building will cost $18,486. This brings the estimated total cost for all work relating to the windows, doors, and exterior walls to $100,356

The repairs to the roofing deck that leaked because of poor draining investigated by Mr. Archuletta is estimated by Mr. Mills to cost $38,424.

Mr. Mills also estimated the costs relating to the repairs identified by Mr. Archuletta that needed to be made in the interior of the home. This includes repairing the "pops," replacing or repairing interior drywall, including refinishing it to Level 4 at a "hard" cost total of $116,805. The kitchen dishwasher repairs including the cabinetry totals $3,030, while the repairs to the stair treads will cost $2,355. Adding these interior costs together, Mr. Mill estimates the total "hard costs" for interior repairs or replacements is $122,190.

In addition to hard repair costs, Mr. Mills explained that certain customary "markups" must be added including 15% additional to each item for general conditions that include such costs as the time for a site superintendent to be present as well as a project manager. This total amount is $70,959. Added as an additional markup is a customary percentage added for "overhead." Most contractors add an amount in the 10 to 20% of the total hard costs for this line item, so Mr. Mills added a rather conservative amount of 12%, or $56,757. Lastly, profit of 8% for the companies who will be involved it the range of repair work bring the total construction costs for all of the work estimated by Mr. Archuletta to $638,632.

The final area of costs associated with this repair and replacement work on the Project are incidental or consequential costs including government permitting ($19,159), the costs to Claimants for the contractor's use of their utilities ($4,000), building and space permits ($19,159), and the architectural and engineering costs to draw up the plans and specifications for the work ($76,736.)

11

Mr. Mills estimated that it will take 9-10 months from the setting up of scaffolding until the work is completed. There will be some additional time to accomplish curing of the stucco. Therefore, Mr. Mills expects that Claimants and their children will have to vacate the Project while off of this work is accomplished, and so he has added 12 month rental cost for temporary housing at $12,000 per month (totaling ($150,000), $10,000 for movers to pack up the belongings they will not need while in temporary housing, including their furniture, and a total of $12,000 for storage of these items ($1,000 per month).

Therefore, Mr. Mills estimated that the total costs for completing the repairs and replacement, both direct and indirect, totals $1,006,222.

In addition to this estimating work, Mr. Mills also was asked to review the repair and replacement costs estimated by Respondent's expert, Mr. Vanecko.

First, he disagreed with Mr. Vanecko' estimate that the Claimants will only have to move out for three months, which he estimates will cost a total of $30,000 ($10,000 per month). Even Mr. Vanecko's more limited scope of repair work will require Claimants to vacate the Project for at least six months. He also believed that the estimate for temporary toilets and parking at $1590 and $6,000 respectively are too low.

In looking a several repair items, Mr. Mills believed that the unit cost for patching interior drywall at $.75/sq. ft. is too low, as is the unit cost for stucco repairs (not replacement). Because Mr. Vanecko is not estimating a significant amount of stucco replacement, Mr. Mills believes the unit price for this work will be significantly more because the total square footage is low.

On cross-examination, Mr. Mills pointed out that the option of leaving Claimants' belongings in the home while the work was being done was not practical and it would cost more to pay workers to keep moving the furniture and other items around in the house. He also disagreed that it was practical for Claimants and their children to stay in the home once the interior work was completed. Mr. Mills explained that the large scope of exterior work would be so loud and distracting that it would make it impractical for the family to stay in the home, particularly if Claimants were working from home.

However, Mr. Mills conceded that if the Arbitrator concludes that Mr. Vanecko's scope of work is sufficient to remedy the defects, then Claimants may be able to stay in the Project while the exterior work is performed. Thus, the total time for move out could be reduced to six months. This is because Vanecko is not calling for the replacement of all windows, and the removal and replacement of all stucco and wood siding.

Mr. Mills also disagreed with Mr. Vanecko's estimate that Mills's estimated cost for the remediation work called for by Archuletta's report can be completed for a total of $700,000. He noted that Mr. Vanecko's cost estimate did not include all items in Mills's estimate.

### E.  Barry McShane

Mr. McShane is the owner of Amber-Tru Construction. He was born in Ireland and immigrated to the United States in 2004. He graduated with a degree in civil engineering from the University of Australia in 1996. Once here, he obtained a general contractor license in 2006. He has been engaged in residential construction and remodeling work almost all of which is in San Francisco.

Mr. McShane met Claimants in early 2014 through their architect, John Perlman with whom McShane had worked before. Except for carpentry work needed for the installation of doors and windows, all of the work in building the Project was done by subcontractors. He used sub-contract proposals for the subcontractor work and there were not formal sub-contracts.

The work in constructing the Project was completed in 2015, and a certificate of occupancy was issued in March 2016.

He started receiving complaints from Claimants about window leaks around January 2017. They said that the bottom of windows were getting damp. Mr. McShane put together a timeline of when and what complaints he received. (Ex. 1049) When he received the complaint in January 2017 he water tested with a hose the window in question and found water coming in from the perimeter of the window. To fix the leak he put sealant around the window.

The next month, he received a complaint about water at the bottom of the kitchen nook windows. He saw the water and put sealant around those windows too.

On December 3, 2018, he received a message that there was water coming into the Powder Room (North facing). He came out to the Project, removed the siding at that location and reflashed it.

He was contacted again on April 4, 2019, about the same condition in the Powder Room reoccurring. He resealed and recaulked the window. He then tested it with a water hose and it seemed to have stopped. He noticed some water on the ceiling that he attributed to "splashing on the deck above."

On November 20, 2019 ,he was called out again about renewed water intrusion at the window in bedroom #1, renewed intrusion at the kitchen nook windows, and a water leak in the laundry room window.

On December 3, 2019, water intrusion was reported in bedroom #3 coming through a conduit. He returned to the property on December 17, 2019 with a representative of Golden State Windows who was a dealer for Marvin and pans were installed at the bottoms of the problematic windows. Golden State was going to contact Marvin about the problems. A Marvin representative came out on January 15, 2020 to look at the problem. The representative was not a technical person. A different representative from BMD came out on behalf of Marvin on January 30 and water tested about seven windows.

13

On March 9, 2020, a Marvin representative came to the Project and injected sealant in the corners of certain windows. These windows sealed were the same ones where the retrofit pan flashing had been installed earlier. Mr. McShane looked at some other windows about which there were no complaints and he saw no indications of water leaks in those windows.

On June 17, 2020, the windows near the front door, the kitchen nook and bedroom #1 were retested and no leaks were found.

The Smith Emery negative water test results were given to Mr. McShane on August 20, 2020. He considers negative water testing to be "rather severe" testing. Water leaks were found in windows 13, 15 and 16 on the East side of the home. No leaks for windows 12 and 14. (Ex. 1051). Leaks in windows 20 and 21 of the West side were leaking but windows 17, 18, 19, and 22 were not leaking. (Ex. 1051) Window 21 (bedroom #1) leaked while windows 12, 23, and 25 were not leaking along the South wall. (Ex. 1052) Windows 6 (Powder Room) and 10 (living room near front door) as well as windows 7 (kitchen nook) and 8 (dining room) leaked along the North wall. Retrofit pans were installed in all leaking windows as well as windows 9 and 11 which were not leaking.

At some point Mr. McShane wondered if the window product itself was faulty.

The exterior stucco was a three-coat system. It has a hand trowel, smooth finish and looks like concrete. It is prone to cracking and Mr. McShane discussed this with Ms. Harvey. While he was at the property he only saw hairline cracks and none greater than 1/16th of an inch.

As to the exterior paint peeling, Mr. McShane explained that the siding was not painted. It was only stained and he explained to Claimants that it needs to be restained every year. (Ex. 1048). Amber-Tru employees did the original staining of the wood exterior walls. The finish fades quickly and need repainting regularly.

Mr. McShane is unsure if stucco that is less than 7/8th of an inch thick is more likely to crack. He agreed that if the stucco is too thin it "would be prone to cracking."

As to window product defects, Mr. McShane does not recall thinking the Marvin windows were actually defective. (Ex. 110). It was a puzzle to him what was going on with the leaking windows as of June 2020 when he authored an email that included his statement that "Marvin provided faulty windows." (Ex. 109) He had no true knowledge of whether the window products themselves were defective. He remembered that there was one "really bad one" that he thought was maybe defective.

The general contract he entered into with Claimants contains a "performance standard." (Section 2(a)). He noted that his company tried its best but he agreed that water intrusion into the interior of the building is not industry standard.

The flashing at the Bay Window was put on the inside and not on the outside for aesthetics, and it did leak at the top of the window. Later a problem was found with water on the

deck of the Bay Window but he is not sure if the water was coming directly from the deck defect or from the leaking flashing.

### F. Seamus Vanecko

Mr. Vanecko is a licensed general contractor who began working in construction as a laborer in 1984. He has a bachelor's degree from Trinity College, and he studied construction management at UC Berkeley. Approximately 5-25% of his work time is in construction management work and the remaining 75-95% is taken up with consulting work. He consults with both plaintiff and defense counsel in construction disputes.

Once retained as a consultant in this dispute Mr. Vanecko reviewed the claims, photographs, plans, deposition transcripts, and he conducted his own water tests at the Project. He has made a total of three site visits and conducted his water testing on his last visit. In total he has spent 80 to 100 hours consulting in this matter.

His direct examination began with a PowerPoint slide show demonstrating the four main points he believes supports his primary opinion that the windows at the Project require no more repairs or replacement.

His first point is that after January 2020 and the Golden State retrofit pans were installed there are no more photos of window leaks. The use of the pans is optional per Marvin instructions and they were supplemented by corner seals.

The absence of additional leaks is significant in light of the post-repair weather data reviewed by Mr. Vanecko. This includes the months of October and December 2021 when the data shows cumulative rain of 7.04 inches and 7.34 inches respectively. During this time no leaks were reported, and no one was called out to conduct any additional repairs. The only reported problem was with the upper roof deck drainage problem.

Mr. Vanecko is critical of the use of the negative pressure water testing done by Smith Emery. While based on the ASTM E1105 specifications, he notes that an enormous amount of water was used which was significantly more than normal rainfall. He noted too that the use of E1105 testing on a five-year-old building is not a good test. The E1105 standard is intended for new installations. With a building of this age changes occur including sealant and flashing losing its elasticity.

The Smith Emery negative air water testing also was aggravated by the weather at the time of testing. According to data Mr. Vanecko reviewed, the wind the afternoon of the testing was recorded either at SFO Airport or downtown San Francisco to be 25 mph. This amount of wind added significantly to the negative pressure applied during the testing. Despite this, Mr. Vanecko noted that the water that got through the window openings stopped at the pan and did not get into the framing. In all, he disregards the Smith Emery results as being "test induced leaks" only.

The water testing by Avelar (Archuletta) were good tests because no negative pressure

was used. While after the testing the litmus paper placed in the window pan turned color, it does not take much water to turn the paper pink. In all while Mr. Archuletta's of testing turned the litmus paper pink, it appears to have stayed in the window pans, and Mr. Vanecko concluded that this was "incidental water" as described in Section 3.2.1 of the E2128 testing standard for water testing building walls.

Mr. Vanecko conducted his own water tests as he wanted to see if the window products were defective. In all he tested three windows. Two did not leak and the third one had "less than a drop."

Turning to the doors, the only one Mr. Vanecko found evidence of leaking was the La Cantina doors. While Mr. Archuletta recommends replacing these doors, Mr. Vanecko believes this is unnecessary and the leaks can be stopped by repairing the flashing and sealant.

In examining the exterior stucco, Mr. Vanecko found no cracks greater than 1/16 inches thick. His repair plans include covering the stucco with overlay and mesh to improve its aesthetics, however, it is not technically defective.

In the Bay Window he recommends replacing the stucco in that area and to reflash the windows.

Mr. Vanecko agreed that there was "a lot" of drywall pops in the interior of the house. He thinks the use of blue tape to call them out in the photos "exaggerated" the number of pops. He believes a Level 4 application of the walls after the pops are fixes is sufficient. No skin coating is needed.

As to the exterior wood siding, Mr. Vanecko believes it is failing since he saw bubbles in the latex paint he believes was used. If stain had been used there would be no bubbling. He believes that repainting is a sufficient fix, noting that 2/3s of the wood will need to be repainting as part of the window repairs.

Exhibit 1001 is Mr. Vanecko's plans for repair work and the expected costs. He also prepared Exhibit 1002 which compares his scope of repairs and costs with those based on the opinions of Messrs. Archuletta and Mills.

His repair estimates, including hard costs and incidental expenses similar to those added by Mr. Mills, total $269,773.68. Added to this is a three month move out at $10,000 per month, or $30,000 additional. If a decision is made to remove all windows in the building and reflash them this can be done for an additional $50,000 to $60,000 additional. It will also extend the total time for the remediation work to be completed and additional month of move out will be necessary. Mr. Vanecko does not think there is any need to move out furniture or belongings into storage as the workers can simply move the furniture into the middle of the rooms while the work is done.

On cross-examination, Mr. Vanecko summarized areas of repair with which he agreed with Mr. Archuletta, including:

Upper Deck Area (overflows)
Windows (those not already repaired by retrofit pans and sealant)
Bay Window
La Cantina Doors (needing repair and not replacement)
Interior Drywall

Moreso, it is the scope of repairs needed where the experts disagree.

Mr. Vanecko was unaware that Claimants testified that there were window leaks found after the retrofit work had been completed. He not convinced this actually occurred because there is no "documentation" of additional leaks, and thus, Claimants' testimony is not "confirmed."

As to the retrofit work, Mr. Vanecko described what he believes was done, including drilling small holes in the window framing corners at the bottom and injecting sealant into the holes. He did not know what type of sealant was used, and he saw no documentation relating to these repairs. In all, the witness believes that ten windows were repaired.

Mr. Vanecko did not see any evidence of water leaks around the exterior edges of the windows. There was no evidence of staining of the plywood substrata from rain intrusion. While sealant had been placed around the windows, he saw no evidence that backer rods had been installed and he does not know if they were "spec'ed out."

From March 2020 until July 2020 when Smith Emery came out and did its testing, Mr. Vanecko does not know if it rained during that timeframe. He "discredits" Smith Emery's findings and report, and it would not change his opinion about the testing if it was Marvin who recommended that firm. While some leakage was found, it would have stayed in the pan and evaporate over time. Avelar's testing produced only incidental water.

Returning to the condition of the exterior stucco, Mr. Vanecko agreed that a significant change in stucco thickness can increase the chances of cracking. He believed that 7/8 inch is the nominal recommended thickness. He did see some "nominal" rusting of the stucco wire lath but Mr. Vanecko believed it was not enough to impact the integrity of the stucco finish itself. If there is effervescence on the exterior of the stucco, it usually results from leaching of moisture from the stucco itself.

As to the upper roof deck, Mr. Vanecko agreed that the problem resulted from no overflow drains being installed. However, it also believes that the lack of regular maintenance in removing accumulated sediment was a contributing factor. His recommendation was to install a secondary drain in the original area or install a new drain that exits this area of the building. He was not sure if basket drains will fit below the pavers.

Even if the decision is made to remove and repair the windows rather than to replace them, Mr. Vanecko believes this can be easily done.

Mr. Vanecko did not believe that the interior drywall finish was a Level 4 finish. To now

bring it up to a Level 4 you need to repair the cracks and the nail pops. Cracks around the interior side of the door and windows also need to be repaired. Mr. Vanecko agreed that installing drywall over wet framing members can cause pop outs.

The witness' time estimate for a three-month moveout includes the time that the interior repair work is underway. He believed it was reasonable for Claimants and their children to return to the Project and live there while the exterior work was done. An additional month of move out will be needed if all of the windows are to be removed, reflashed, and reinstalled.

## III.
## Analysis

There is no dispute that in many respects, the construction of the Project was defective and requires substantial repair and remediation. Therefore, there is essentially conceded that the construction contract entered into by the parties was breached by Respondent, including the contract Performance Standard (Paragraph 2(a)). Instead, the focus of this arbitration is on the scope of the harm caused by the construction defects, and the methods and costs needed for the repairs and remediation work.

In deciding to what extent Respondent breached the Project contract by performing defective construction work, and whether and to what extent Claimants were damaged as a result of that breach, it must be emphasized that Claimant bears the burden of proof by a preponderance of the evidence. "A party required to prove something by a preponderance of the evidence 'need prove only that it is more likely to be true than not true.'" (CACI No. 200.) Preponderance of the evidence means ' " 'that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed.'" (Italics added.)' (*Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 325, 276 Cal.Rptr. 430, fn. Omitted.) In other words, the term refers to 'evidence that has more convincing force than that opposed to it.' (BAJI No. 2.60.)" (*People ex rel. Brown v. Tri-Union Seafoods, LLC*, (2009) 171 Cal. App. 4th 1549, 1567; *Env't L. Found. V. Beech-Nut Nutrition Corp.*, (2015) 235 Cal. App. 4th 307, 322.)

Therefore, in looking at the evidence to determine causation and damages, the Arbitrator must determine if the preponderance of the evidence supports Claimants' claims for defects, and the scope and cost for repairs and remediation.

Messrs. Archuletta and Mills appeared credible. Despite Mr. Archuletta having worked with Claimants' counsel's firm on 30 or more cases over the years he did not appear to be biased or was Claimants' counsel's "shill" at the hearing. Nor did it appear that the possibility these two experts may ultimately participate in the repair work influenced their opinion testimony concerning the scope of needed work or the cost of that work.

Mr. Vanecko, who works virtually full time as a construction claim consultant, appeared to be a bit more of an advocate for Respondent's position on the scope and cost of repairs than did Claimants' experts. For example, he concluded that virtually all window leaks stopped after the pan and sealant were added to those windows known to be leaking because there was no

"documentation" of further leaks. Yet, he apparently was aware that Claimants testified leakage continued even after counsel was retained but they felt there was no longer a need to "document" this continuous, vexing problem. Mr. Vanecko's conclusion appeared to trivialize the testimony of Claimants who explained why they stopped recording each continuing episode of water intrusion.

Even more insensitive was Mr. Vanecko's conclusion that Claimants would only need to rent an outside housing unit for three months while interior work was ongoing. In his view Claimants, who both work remotely from home while caring for their three young children, could then return to living full time at the Project even while significant exterior work was still being performed. This is simply not feasible.

The most significant area of disagreement is the extent, if any, the residence's Marvin windows need to be further repaired, or worse, replaced. The preponderance of the evidence does not support the conclusion that the leaking at and around the windows is the result of a product defect requiring replacement of the Marvin Windows as opposed to improper flashing and sealing of the windows which can be repaired.

While Mr. Archuletta found no specific product defect in the windows themselves, nevertheless he believed that all windows in the residence should be removed and replaced with new windows. Instead of pointing to defects in the windows themselves, he appeared to rest his opinion that new windows will raise the "comfort level" of the Claimants who have endured window leaks for so long. In support of his recommendation, Mr. Archuletta also referred to a written communication from Amber-Tru to the Claimants expressing the view that the windows are "faulty." (Ex. 109) As Mr. McShane explained during his testimony, his musing about the possibility that the windows themselves were "defective" was not grounded on any hard evidence. To the contrary, Mr. Archuletta's opinion that new flashing around the windows is also needed somewhat undercuts his opinion about the need to replace all of the windows.

Mr. Vanecko sees no need to replace all of the Marvin windows, and concedes that, if the evidence supports some additional repair of the windows, then removal, reflashing and resealing would be sufficient. He estimates this alternative work will add an additional $50,000 to 60,000 to his cost estimate, and will add an additional three month off-site occupancy in which case his original estimate of off-site rental will rise from three to six months.

In looking at the history of window frame leaking and the "on again, off again" repairs that various entities engaged in over four years, Mr. Vanecko opined that very little repairs to the flashing and sealing of the windows are still necessary. As noted earlier, Mr. Vanecko believes all window leaks ceased when reporting stopped before 2020. This conclusion overlooks the testimony of Claimants who reported continued window leaks, even some occurring on windows previously "repaired." In sum, Claimants reported that a majority of the residence windows leaked with Ms. Harvey referring to the problem as being "persistent." As referenced in Claimants' closing reply brief, a total of 15 windows were reported as continuing to leak after

the repairs referred to by Mr. Vanecko had been completed. (Claimants' Reply, pp. 2-3, with record citations.)

While Mr. Vanecko is critical of the Smith Emery negative air water testing it cannot be overlooked that it was Marvin and/or Mr. McShane who recommended Smith Emery to perform the standardized testing. In doing so, Smith Emery followed the ASTM E1105B protocols, which Mr. Vanecko found non-credible.[1]

The Arbitrator concludes that the testing by Smith Emery, in addition to that performed earlier by Mr. McShane, Marvin designees, and Mr. Archuletta legitimately and consistently found water intrusion through multiple windows, some reoccurring even after it was earlier reported that the leaking had stopped. While Respondent argues that no more than ½ of the windows in the Project had exhibited water leaks the Arbitrator is satisfied that a significant majority of windows have exhibited leaks; some reoccurring. While the Arbitrator does not believe that the preponderance of the evidence supports replacement of all windows, systematically reflashing and resealing the windows with adequate documentation best ensures that this nagging problem will come to an end.

Based on Mr. Mills' cost estimates (Exhibits 83-85) deleting the removal and replacement of the windows reduces his estimate by a total of approximately $72,000. It appears that the cost of replacing flashing and sealing around the windows is already included in the estimate.

Another major disagreement between the experts is what exterior repair work is needed, both on the smooth stucco exterior walls and the wood sided paneled walls. Mr. Archuletta's report (Exhibit 81) includes the defects he found based on his work and inspection. These include defects in the exterior cement (stucco) plastering including excessive cracks (Exhibit 60, page 571), exterior cracking near the west side bedroom windows (Exhibit 100), cracking throughout the west elevation wall (page 1264), water damage around an exterior light fixture (page 1270), indications of water leaching out of the exterior stucco because of no seal joint (Exhibit 102), and many cracks in the stucco.

His investigation included destructive testing which revealed discoloration behind the stucco and rusting of the lath wire both indicating moisture passed through the stucco. (Exhibit 62, page 621) In some areas he found and reported stucco that was thinner than the industry standard which would cause weak points tending to create cracks. (page 632) His examination of

---

[1] In addition to Mr. Vanecko's criticism of the paucity of weather data at the Project site when the Smith Emery negative testing was conducted, the Arbitrator cannot overlook the irony of Mr. Vanecko's additional criticism that the ASTM E1105B testing should not have been used because the Project was not a "new" building. Claimants' residence has been the subject of relentless construction defects affecting the "new" residence constructed for them by Respondent beginning only months after they began their occupancy. Attempting to criticize the Smith Emery testing report because the patina of the Project's "newness" may have been eroded by protracted inspections and repairs over several years is not a convincing basis on which to diminish the efficacy of those test results.

the north elevation, which he water tested, showed that the stucco joints were not tight, allowing water to pass through the stucco (page 246). In another location he found that the J-mold was not long enough, allowing the intrusion of water (page 247). His moisture readings of 17, 18, and 19 at the plywood surface under the stucco were high (pages 252-253).

The condition of the Bay Window on the north elevation was defective as well. This included cracking and staining under the window (Exhibit 61, page 585), large corner cracks in the pop out (page 586), rusted lath wire and staining on the back of the stucco (page 600), stucco less than ½ inch thick in some places, and other indications that there was water intruding through the stucco at this location (page 615). Exhibit 106 itemizes many of the stucco defects discovered by Mr. Archuletta through this area including photographs on pages 1417, 1422, 1427, and 1435. At one location where he had not performed any water testing, the water meter reading was 35 (page 1439). Mr. Vanecko confirmed his agreement that the Bay Window area needs repairs, although he disagrees that all of the exterior stucco needs removal and replacement.

Mr. Archuletta's opinion was that much of the exterior stucco was not installed properly and that all of the stucco should be removed and replaced. He noted also that in some locations, such as the West Side, the stucco was in tight or smaller areas around windows that need further repair or replacement, and it was easier (i.e. less costly) simply to replace all of the stucco here.

In addition to the stucco issues, the exterior wood siding was defective. In some areas the paint was peeling off the wood indicating the lack of any primer. Such large areas of unpeeling indicate the paint was put directly on raw wood. There is no adhesion between the paint and wood unless a primer is used first. (Exhibit 53, pages 359, 361; Exhibit 97)[2]

In examining the exterior stucco, Mr. Vanecko found no cracks greater than 1/16 inches thick. Although the repair plans include covering the stucco with overlay and mesh to improve its aesthetics, it is not technically defective. Mr. Vanecko agreed that a significant change in stucco thickness can increase the chances of cracking. He believed that 7/8 inch is the nominal recommended thickness. He did see some "nominal" rusting of the stucco wire lath but Mr. Vanecko believed it was not enough to impact the integrity of the stucco finish itself. If there is effervescence on the exterior of the stucco, it usually results from leaching of moisture from the stucco itself.

As to the exterior wood siding, Mr. Vanecko believes it is failing since he saw bubbles in the latex paint he believes was used. If stain had been used there would be no bubbling. He believes that repainting is a sufficient fix, noting that 2/3s of the wood will need to be repainting as part of the window repairs.

---

[2] Mr. McShane testified that the exterior wood paneling was stained and not painted. The photographic evidence does not support this statement. Also, Respondent speculation that the painting was done by Claimants after they moved it is unsupported by the record evidence. (Respondent Reply Brief, p. 4.) Also, in error is Respondent's statement that Claimants have lived in the Project for "over 7 years." (*Ibid.*) The record is clear that they moved into the Project in the Spring of 2016.

The preponderance of the evidence supports the conclusions reached by Mr. Archuletta as to the poor, deteriorating conditions of the five-year old exterior stucco and wood paneling that were improperly installed and finished. Time and again the narrative descriptions of how, where, and why the exterior building surfaces were defective are complimented by detailed photographic evidence supporting the narrative. Indeed, one of the more striking sets of photographs that impressed the Arbitrator are those showing the unsightly web of multiple cracks along the smooth stucco exterior. While some of these cracks may be cosmetic, the underlying defects found in the thinness of some of the stucco, evidence of exterior water intrusion, and the rusting of the five-year old underlying mesh all support the conclusion that the stucco needs replacement.

Mr. Mills' estimates the replacement lath and stucco will be a three-coat system and will cost a total of $111,646. The removal, replacement, and repainting of the exterior wood walls will total $88,503. The exterior repairs relating to the Bay Window, which Mr. Vanecko agrees needs repair, will cost a total direct cost of $10,365. The total direct costs for all exterior work of $211,566 is supported by substantial evidence.

An additional area of repair where the experts agree is the Upper Deck Area (overflows). Mr. Archuletta recalled that he was first called out when there was an upper roof deck leak that was intruding into the bedroom below. The deck pavers were removed and standing water was found. The pedestals that support the pavers were covering some of the drains. He found that the as built condition of the deck drains were not the same as called for by the plans. The plans showed larger drains which were covered by dome grates. These offer better protection against sediment clogging. (Ex. 9, p. 21) There were breaches in the deck membrane found that allowed the backed-up water to seep down into the bedroom. This caused bubbling of the bedroom ceiling, and damage to the sheet rock in the baseboard area. (Ex. 56, pp. 413, 415) Once the ceiling was exposed it revealed damage to the ceiling wood framing which was confirmed by a high moisture meter reading. (Ex. 56, p. 423) The repairs needed removal and relocation of the pedestals, and the installation of new drains, grates, and membrane.

On cross-examination, Mr. Vanecko confirmed his agreement with Mr. Archuletta's assessment that the Upper Deck Area (overflows) need repair although he faults the lack of suitable maintenance as a contributing cause. Given the defective conditions associated with the Upper Deck Area, the Arbitrator is not convinced that lack of maintenance contributed to the need for repairs.

Returning to Mr. Mills' cost estimates, the work needed to repair the Upper Deck Area is $38,424, a sum found to be supported by substantial evidence.

There were four general areas of interior repairs discussed by the experts. The most significant was the need to repair "screw pops" and interior cracking. The other three areas of interior work include repair surrounding the La Cantina door, kitchen cabinet damage resulting from its proximity to the dishwasher and the hot moist air necessarily distributed by that life-improving home appliance, and the need to reconnect the interior stair tread that has separated.

Another graphic detail emphasized by photographic evidence was the large number of "screw pops" found literally everywhere throughout the interior. They are noted with blue tape in the site photos. (Exs. 35, 36, 38) The pops were random. Based on the large number of them, Mr. Archuletta concluded that the most probable cause was that the wall framing was wet when the drywall was installed. Mr. Vanecko agreed with this probable cause theory. The necessary repair is to rescrew the drywall and refinish it once again. This includes repairs at the baseboard as well. Mr. Vanecko agrees that when these are repaired a surface coating with a Level 4 application will be sufficient.[3]

Mr. Miller estimates the costs of repairing the "pops," replacing or repairing interior drywall, including refinishing it to Level 4 at a "hard" cost total of $116,805. The kitchen dishwasher repairs including the cabinetry totals $3,030, while the repairs to the stair treads will cost $2,355. Adding these interior costs together, Mr. Mill estimates the total "hard costs" for interior repairs or replacements to be $122,190. Although Mr. Vanecko believes and estimates that these repairs can be completed at a lower cost, in light of all of the relevant evidence as to this issue, Mr. Mill's estimates are supported by a preponderance of the evidence.

The last interior item found to need repair is the La Cantina doors in one of the major bedrooms leading to the exterior. Mr. Archuletta noted the discovery of water intrusion on the inside corner of this door. (Ex. 63) His recommended fix is to remove, reflash the opening, and install a new door assembly. He also found evidence of staining on the wood flooring at the corner of the east facing sliding door that needs repair. (Ex. 107, pp. 1509-1510) Also, all of the stucco around the La Cantina doors needs replacement. (Ex. 81)

On cross-examination Mr. Archuletta agreed with Mr. Vanecko that reflashing the doors and repairing the wood staining around the edge of the doors are all that is necessary and there probably is no need to replacement the door assembly. It appears from Mr. Mills' "take off" that eliminating the replacement of this door reduces the costs by $6,800.

Based upon the preponderance of the evidence standard, it is more likely than not that the "hard costs" needed to repair the extensive construction defects total $473,061, less $72,000 for the elimination of the Marvin window replacement plus an additional reduction of $6,800 in not replacing the La Cantina doors. This net hard costs total $394,000. Based on a comparison between the estimates of Mr. Mills and Mr. Vanecko for the same items of repair, Mr. Vanecko's total costs for the Archuletta scope of work is approximately $320,000.

Of course, Mr. Vanecko's hard cost estimate for the work *he* feels is necessary totals $166,835—an aggregate number that is much less than the Archuletta/Mills estimate. For all of the reasons stated earlier and as they appear from the witness' testimony, Mr. Vanecko's work and cost estimates are grossly low, while those described by Messr. Archuletta and Mills appear to be supported by a preponderance of the evidence.

---

[3] In their closing briefs counsel disagree whether Messrs. Archuletta and Mills were calling for a Level 4 or Level 5 interior finish. The preponderance of the evidence is that a Level 4 interior finish is contemplated.

In addition to the total "hard costs" of $394,000 shown by the preponderance of the evidence, the Arbitrator adds the following indirect costs and expenses based upon percentage adjustments for this new total of costs[4]:

| | |
|---|---|
| $59,100 | General Conditions |
| $47,280 | Overhead |
| $31,520 | Profit |
| $19,159 | Permit allowance |
| $47,280 | Architect and Engineering fees |
| $4,000 | Utilities reimbursement |

Adding these additional costs found to be supported by substantial evidence, the total construction cost is $602,339.

Finally, the closing briefs of the parties included evidence from third party experts in real estate estimating the monthly rental costs Claimants will incur in having to move out of the Project while the repair work is being prepared for, undertaken, and completed. Two different approaches are taken by the experts:

Claimants' expert, Walter Ricci, uses a per square foot unit rental cost based on the estimated square footage of the Project totaling 2,673. His declaration sets forth his due diligence in locating comparably sized rental properties in the neighborhoods near the Project. Based on the historic square foot rental cost in the area where Claimants live, Mr. Ricci estimates rental costs totaling $12,000 to $13,500 per month will be incurred to rent comparable property.

On the other hand, Respondent's real estate expert, Eric Russell, estimated rental costs based on actual current listings which range from approximately $6,000 per month to $8,500 per month. The square footage of these units is not included, except for two believed to be 2100 sq. ft. and 2,000 sq. ft. Both of these units are 20-25% smaller than the Project.

Based on this evidence, the Arbitrator concludes that a rental rate of $12,000 per month is that which is best supported by the evidence.[5]

---

[4] The percentages assigned to indirect and overhead/profit costs by the experts are quite close (Mr. Vanecko's comparison of costs dated May 25, 2022, ATC_000990.) It is the Arbitrator's conclusion that those percentages recommended by Mr. Mills should be applied to "hard costs."

[5] In Respondent's Closing Reply Brief, counsel requests the Arbitrator to take judicial notice that Claimants also own a three-bedroom home in Incline Village, Nevada, and could use that property while the repair work was performed. Claimants filed a Sur-Reply opposing the motion. No offer of proof accompanied this request for judicial notice, and no good cause has been shown that the information was not available before the evidentiary hearing ended. Therefore, the request is denied. Moreover, even if judicial notice were granted, this evidence is insufficient to mitigate Claimants' rental expense claim. It was contemplated by both sides that the rental property would be located near the home on Gratton Street, and Claimants' three young daughters will need a home in that area to continue in school during the almost one-year they will be out of their home.

The evidence discussed in this Final Award as to the length of time Claimants and their children will have to move from the Project while the repair work is being prepared for, undertaken, and completed, depends on the scope of the work. Originally, Claimants' experts estimated they will have to vacate their home for 12 months, assuming the Marvin windows are all replaced. Respondent originally estimated three months, increasing the vacancy period to six months if the windows are all reflashed and resealed and not replaced. Based upon the preponderance of the evidence, the Arbitrator concludes it is more likely than not that a rental period of nine months is the most reasonable estimate for Claimants' vacancy. Using the above-referenced monthly rate of $12,000 to rent a suitable replacement, a total of $108,000 damages in having to find replacement lodgings while the necessary repairs are being prepared for, undertaken, and completed.

Only Respondent's expert offers a cost estimate for moving Claimant's furniture in and out of a rental unit and it assumes they will have the benefit of their furnishings rather than need to have them stored while Claimants find a furnished rental unit. This appears to the Arbitrator to be a preferred process, and therefore, $10,000 is added to the total damages awarded to Claimants.

Therefore, in light of all of the foregoing, the Arbitrator awards to Claimants $602,339 in construction damages, plus $108,000 for rent when the necessary repair work is done, plus $10,000 for service expenses in moving Claimants' furnishings into and out of their prospective rental unit. The additions of these sums results in a total damages award to Claimants of $720,339.00

Therefore, Claimants are the prevailing parties in this arbitration.

# IV.
## Post-Interim Award Motion

Claimants filed a post-Interim Award motion for attorney fees and costs, seeking a total of $339,451.61. Of this total amount, $202,095.00 was requested for attorney fees,[6] $27,076.61 for professional investigation services, and $110,280 for litigation costs, including reimbursement for their share of JAMS arbitration costs. In their reply brief filed on October 16, 2022, Claimants stated that a mistake had been made earlier in itemizing costs. According to Claimants, $51,441.08 has been mistakenly characterized as litigation costs when this amount should have been included in the professional investigation services category. If allowed, then the investigation services would now total $78,517.69, while the litigation costs would be reduced to $25,358.75. In light of this change, Respondent was granted leave to file a sur opposition brief on October 24, 2022.

In addition to costs recoverable as the prevailing party under the California Code of Civil

---

[6] This sum includes $178,616.50 requested in the opening brief in this post-Interim Award motion, and an additional $23,478.50 incurred since the motion was filed as confirmed in the reply brief. (See, Suppl. Decl. of Bryce Carroll.)

Procedure (CCP), Claimants note that the underlying construction contract they entered into with Respondent included the following clause in Section 9(b):

> "In any action or proceeding to enforce or construe this [construction contract] the prevailing party shall be entitled to recover their actual attorneys [sic] fees and costs."

The opening sentence of Respondent's opposing brief admirable states "Respondent Amber-Tru Construction does not take issue with the attorneys' [sic] fees requested in Claimants' brief or supporting declaration." However, there are several elements of costs Respondent contends are not allowable under the CCP, particularly where there is no predicate offer to settle made before the arbitration under CCP §998. In particular, Respondent challenges Claimants' attempt to recover non-investigative litigation expert fees, expert witness fees, and hearing transcripts. (Respondent's Oppo. Brief, p. 2.)

The challenged expert fees are not those recoverable as so-called *Stearman* costs, which allow the recovery of expert fees as an element of damages incurred in connection with non-litigation investigation to determine the nature and extend of damages. (*Stearman v. Centex Homes*, 78 Cal. App. 4th 611, 625 (2000).)

Respondent correctly notes that, absent a "successful" pre-arbitration CCP §998 offer, or unless ordered by the court or arbitrator, expert fees incurred in the litigation or arbitration are not recoverable per CCP §1033.5. That section limits recoverable costs to the categories listed in the statute. It specifically excludes certain categories of costs from recovery including the following:

> (b) The following items are not allowable as costs, except when expressly authorized by law:
>
> (1) Fees of experts not ordered by the court.
>
> (2) Investigation expenses in preparing the case for trial.
>
> . . . .
>
> (5) Transcripts of court proceedings not ordered by the court.

In support of its position that litigation expenses are not recoverable as costs, Respondent cites to a number of judicial decisions it claims have confirmed Respondent's position over the years. "(*Hsu v. Semiconductor Sys., Inc.* (2005) 126 Cal.App.4th 1330, 1342 [trial court erred in awarding expert fees where contract authorized recovery of 'all fees, costs and expenses']; *Fairchild v. Park* (2001) 90 Cal. App. 4th 919, 922 [trial court erred in awarding expert fees where contract authorized recovery of "all costs and expenses]; *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1624 [trial court erred in awarding expert fees where contract authorized recovery of 'attorney's fees and costs']; *First Nationwide Bank v. Mountain Cascade, Inc.* (2000) 77 Cal.App.4th 871, 878 [trial court erred in awarding expert fees where contract authorized recovery of 'all necessary expenses, including attorney's fees']; *Robert L. Cloud & Associates,*

*Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1154 [trial court erred in awarding expert fees where contract authorized recovery of attorneys' fees].)" (Respondent's Oppo. Brief, p. 3.)

Claimants dispute that the cases cited by Respondent prevent contracting parties from agreeing to prevailing party cost recovery that exceed those allowed by statute. In their view, the reference in the parties' contract that "prevailing party shall be entitled to recover their actual attorneys [sic] fees and costs" meets this legal standard.

The cases are far from unanimous on the issue of whether contracting parties can include an express provision for the recovery of potential litigation costs that exceed those allowed by statute. The first case cited by Respondent, *Hsu v. Semiconductor Sys., Inc.* (2005) 126 Cal.App.4th 1330, did not hold that parties are prohibited from contractually agreeing to the recovery as prevailing party to costs that are otherwise excluded under CCP 1033.5. To the contrary, albeit in dicta, the court referenced cases that do allow parties to agree by contract to the recovery of fees that exceed section 1033.5, as well as contrary decisions that upheld "the Legislature's intention that Civil Code section 1717 be uniformly applied precludes litigants from adopting a definition of costs different from the statutory definition." (*Hsu v. Semiconductor Sys., Inc., supra* at p. 1341.) However, in *Hsu* the appellate court declined itself to decide whether the parties' contract allowed them to exceed the statutory cost recovery in section 1033.5, because the parties did not raise the issue and have it decided in the trial court. (*Ibid.*)

Respondent's second case, *Fairchild v. Park* (2001) 90 Cal. App. 4th 919, cited in *Hsu* does support its position that parties are prohibited from expanding the recovery of litigation costs beyond those allowed by section 1033.5:

> We need not reach the question of whether the parties intended the words "all costs and expenses" to include items disallowed under section 1033.5 of the Code of Civil Procedure. Assuming that the parties so intended, the question is whether the scope of the term "costs" as used in Civil Code section 1717 can be enlarged by contract beyond the costs allowable under Code of Civil Procedure section 1033.5. We conclude that it cannot. (*Id.* at p. 929.)

In *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1624, the appellate court found error by the trial court in awarding expert fees where the parties' contract authorized recovery of "attorney's fees and costs." Once again, the court cited cases that have discussed whether parties may contractually exceed the cost limitations in section 1033.5:

> [T]he Legislature has chosen to provide for the recovery of contractual attorney fees in a cost award. (Civ.Code, § 1717; Code Civ.Proc., § 1033.5, subd. (a)(10)(A); see Stats.1990, ch. 804, § 2.) But the Legislature has declined to adopt that procedure for the recovery of expert witness fees. (Code Civ.Proc., § 1033.5, subd. (b)(1).) Accordingly, assuming expert witness fees may be recovered under a contractual provision, they must be specially pleaded and proven at trial rather than included in a memorandum of costs. Since plaintiffs did not specially plead and prove their right to recover expert witness fees under an appropriate provision of their contract, they were not entitled to such fees and it was error to include

such fees in the cost award. (*Ripley v. Pappadopoulos, supra* at pp, 884-885.)

Once again as in *Hsu*, the *Ripley* panel avoided having to determine if the limitations in section 1033.5 can be circumvented by an express contract provision, and instead denied the request because the issue had not been properly pleaded or proved at trial.

In *First Nationwide Bank v. Mountain Cascade, Inc.* (2000) 77 Cal. App. 4th 871, 876, the court's discussion centered largely on the mechanism used by the appellate court in *Bussey v. Affleck* (1990) 225 Cal.App.3d 1162, to award expert fees as part of a contractual attorney fees recovery which is expressly allowed by statute.[7] However, the court also adopted the approach followed by the appellate panel which decided *Hsu* and *Ripley*, and held that even if parties to a contract may provide for the recovery of expert expenses otherwise excluded as a "cost," "plaintiffs proceeding under such a theory must specially plead and prove their right to recover expert witness fees under an appropriate provision of their contract. (*Ripley, supra*, 23 Cal.App.4th at p. 1627, 28 Cal.Rptr.2d 878.)" (*First Nationwide Bank v. Mountain Cascade, Inc., supra* at p. 879.)[8]

A case not cited by the parties in their briefs is *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal. App. 4th 1050. In that case the parties' lease stated that the prevailing party is entitled to "reasonable expenses" including attorney fees, "court costs, witness and expert fees." The court upheld an award of expert expenses to the prevailing party based on this explicit contractual provision:

> While the Legislature has not adopted a specific provision addressing the recovery of expert witness fees, such fees are, indeed, a cost, and when "expressly authorized by law[,]" they are "allowable as costs" under Code of Civil Procedure section 1033.5, subdivision (b)(1). We therefore see no reason why they should not be recoverable as costs when the parties specifically agree to such a provision in a freely negotiated contract. (*Id.* at p.1066.)

However, in so holding the *Thrifty Payless* court cautioned that allowing the recovery of expert expenses under a contractual prevailing party provision must be carefully considered based on the explicitness of that provision:

> This does not mean—and we do not hold—that expert witness fees are

---

[7] In *Bussey*, the rationale for the award of expert witness fees was the reviewing court's conclusion that when a contract includes an attorney fees provision, the court may award otherwise prohibited cost disbursements of counsel for the prevailing party as an element of attorney fees so long as these expenses are ordinarily billed separately to the client. (*Id.* at p. 1166.)

[8] *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1154, also is not authoritative in deciding this issue. There, the court rejected the trial court's use of the *Bussey* mechanism to include expert expenses as falling within the parties' contractual attorney fee provision. The court "followed *Ripley* and reversed the award of expert fees as part of the attorney fees recovery." (*Id.* at p. 1154.)

recoverable in every case where "costs" are merely mentioned in a contract. A general cost provision should be interpreted according to the established statutory definition. (*Arntz, supra,* 47 Cal.App.4th at p. 492, 54 Cal.Rptr.2d 888.) But where sophisticated parties knowingly and intentionally negotiate a broader standard into their contract—and particularly where, as here, that standard specifically includes "witness and expert fees"—the intent of the parties should be upheld by the court. (*Ibid.*)

If anything is clear from a review of these published appellate decisions it is that, while they are divided as to whether parties may contractually agree to the payment of expert witness litigation costs to the prevailing party in any legal dispute, the provision relied on must clearly so state either in the clause itself or based on parol evidence produced during the arbitration).[9] Here, Claimants have fallen short of meeting this standard. That is, even assuming such a contract provision may provide for a legal exception to section 1033.5's costs exclusions and allow for the recovery of expert fees as a prevailing party, Claimants have not met their burden of proof to warrant this debatable legal exception to section 1033.5.

The contract language at issue is that the "prevailing party shall be entitled to recover their actual attorneys [sic] fees and costs." Do "actual costs" mean all allowable costs permitted by law, or all types of costs whether statutorily excluded from recovery? How does this differentiate from other contract clauses allowing the recovery of "all" costs that have not been found to be a broader expansion from the statutory limitations? This language is simply too uncertain to merit a conclusion that the parties intended to allow the prevailing party to recover litigation-related expenses that otherwise are excluded in statutes enacted by our Legislature.

Also, there has been no evidence produced by either side in this arbitration as to what was intended by this uncertain contractual language, whether the parties were even aware of the statutory limitations on the recovery of litigation expenses to a prevailing party, and that they intended their contract to exempt them from this limitation. For all of these reasons, Claimants' request to interpret the contract to allow them to recover litigation costs despite the statutory limitations noted above is denied.

However, under *Stearman,* investigative expert fees and expenses not related to litigation proceedings are recoverable as damages in construction cases. (*Stearman v. Centex Homes, supra* at p. 624.) Because the "uncontradicted testimony established plaintiffs' entitlement to claim these expenses as damages, they were found by the court to be recoverable. (*Id.* at p. 625.) Neither party contends that the burden of proof is not on Claimants to prove each and every element of its claimed damages.

---

[9] One surprising omission from discussion in all of these cases is how the acceptance of a contractual exception to the cost limitations in section 1033.5, potentially undercuts the intent of CCP §998 offer in compromise. Allowing parties to agree by contract to recover costs otherwise excluded by section 1033.5, potentially circumvents the traditional limitation on the recovery of expert expenses absent a pre-trial or pre-arbitration "998 offer." If so, it arguably diminishes the value of the efficacy of that dispute resolution process, and thus may discourage parties from achieving settlements under section 998.

As noted above, Claimants initially sought $27,076.61 as professional investigation serviced based on counsel's supporting declaration and Exhibits 27, 24-30, and 90. They also initially sought litigation costs totaling $110,280, again supported by counsel's declaration and Attachment 27 through 49. (Decl. of Bryce Carroll, p. 2.) However, in their reply brief Claimants state that $51,441.08 of their originally classified litigation costs were "mistakenly identified in Claimants' Brief as 'Litigation Costs.'" In an accompanying footnote, Claimants add that "[i]t is of no consequence that those items were categorized as 'Litigation Costs' in the Brief—the nature of those costs are clearly investigative." (Reply Brief, p. 5, fn.3) No further explanation is offered as to why these costs should be moved from the litigation cost category to the *Stearman* investigative cost category. While Claimants' counsel includes a Supplemental Declaration with the Reply Brief, that declaration simply addresses the additional $23,478.50 in additional attorney fees sought, and nothing is said about this cost identification issue.

The evidence presented during the arbitration hearing by Claimants' principal expert, Mr. Archuletta, indicated that he was retained by Claimants' counsel whose law firm had a continuing litigation consulting relationship with Mr. Archuletta's firm. After his retention, Mr. Archuletta had been at the site to investigate the complaints of water intrusion three times; twice in September 2020 and a third time in mid-November 2020. However, the invoices Claimants now claim were mistakenly characterized as litigation costs were virtually all submitted by Mr. Archuletta's firm in 2021 and 2022. (Claimant's Reply Brief, p. 5)[10] Respondent's Sur Opposition Brief goes further in referencing evidence that conflicts with Claimants' present assertions that the disputed classified costs were mistakenly and initially categorized as litigation costs. (Respondent's Sur Opposition Brief, pp. 5-6.)

The *Stearman* court, as well as others, allow a claimant or plaintiff to prove by a preponderance of the evidence that the claimed costs by experts were investigative expenses, and thus damages, and not litigation related expenses. As noted earlier, Claimants do not dispute that they have the burden of proving the element of damages in this arbitration. It is clear from what has been submitted, taken in the context of the timing of the expert's retention, investigation, and the commencement of the prosecution of this arbitration proceeding that Claimants have failed to prove that this additional sum of $51,441.08 were expert investigation costs and not litigation expenses. For all of these reasons, Claimants' request that they be awarded $76,779.83 expert investigation expenses is denied.

Similarly, Claimants' request for $3,167.75 for reporter transcripts fees not ordered by the Arbitrator, and $2,250 paid to Respondent's experts for their deposition time are both excluded under CCP 1033.5(b)(5) and (b)(1), respectively.

The only remaining issue is whether three items of claimed *Stearman* investigative expenses totaling $4,426.25, summarized on pages 5 and 6 of Respondent's opposition brief, and on page 6 of Claimants' reply brief should be reduced from the allowable *Stearman* costs claimed by Claimants. Based on the briefs of the parties, and the temporal context discussed above, the preponderance of the evidence does not support a conclusion that these claimed

---

[10] The Demand in this dispute was filed with JAMS by Claimants' counsel on March 2, 2021.

expenses are investigative and not litigation related and thus, are unrecoverable.

**V.**
**Final Award**

In light of all of the foregoing, it is determined as follows:

1. Claimants are entitled to a total damages award of $720,339.00.

2. Claimants are entitled to an award of attorney fees and costs against Respondent in the amount of $202,095 for attorney fees and $27,076.61 for expert investigation expenses additional damages.

3. Claimants request for an award of litigation costs and expenses is denied.

This award resolves all issues submitted for decision in this proceeding.

DATED: 11/9/22

Hon. Ignazio Ruvolo (Ret.)
Arbitrator